[Nos. B100758, B101933. Second Dist., Div. One. Aug. 15, 1996.]

GENERAL MOTORS CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
RON JEFFREY et al., Real Parties in Interest.

**COUNSEL**

Grace, Skocypec, Cosgrove & Schirm, Philip R. Cosgrove, David K. Schultz and Carl E. Lovell for Petitioner.

No appearance for Respondent.

Rowell & Tessier and John D. Rowell for Real Parties in Interest.

**OPINION**

**VOGEL, (Miriam A.), J.**—A driver wearing her seat belt is stopped in traffic. Her car is rear-ended. Although her seat belt remains fastened and does not break, her head strikes the steering wheel and she later mentions to a doctor that "the seat belt didn't hold [her]." Within one year, she sues the driver of the other car and 20 Doe defendants. More than two years after the accident, she substitutes the manufacturer of her car for a Doe defendant and adds allegations that the seat belt was defective. The manufacturer cries foul, claiming the driver knew there was a problem with the seat belt and knew the identity of the manufacturer of her car, and thus was not "ignorant" of its

identity within the meaning of section 474 of the Code of Civil Procedure.[1] The driver disagrees, claiming the mere fact that the seat belt did not secure her tightly to the seat did not make her suspect that the belt's "comfort feature" (which permits it to spool out when the driver leans forward) was defective in that it allowed "the inadvertent introduction of slack." The trial court agreed with the driver and so do we.

## FACTS

On November 5, 1992, Susanna Jeffrey's 1986 Chevrolet Blazer was rear-ended by a car driven by David Katsuro Akazawa. Jeffrey's face hit the steering wheel and she suffered facial injuries, including "traumatic brain injury," a broken nose and broken teeth. Jeffrey hired a lawyer (Philip Dunn) and he sent Jeffrey to Charles Furst, Ph.D. (a clinical neuropsychologist), for an evaluation. On April 27, 1993, Dr. Furst interviewed and examined Jeffrey, who told him that she had struck her nose and abdomen on the steering wheel because "the seat belt didn't hold [her]" or because the "seat belt failed."[2] On July 6, Dr. Furst forwarded a report to Dunn, reciting Jeffrey's history and expressing his opinion of her condition. Included in Dr. Furst's description of the accident is this statement: "She was stopped on the freeway in traffic when she was rear-ended. She experienced whiplash and she struck her nose on the steering wheel, after her seat belt failed, and additionally she struck her abdomen on the wheel also." On October 7, Jeffrey sued Akazawa and Does 1 through 20, claiming damages for personal injuries and property damage caused by Akazawa's negligent driving.[3]

In March 1995, following a non-binding arbitration award against Akazawa for more than $500,000, Dunn associated "more experienced" counsel, John D. Rowell and his firm, Rowell & Tessier. In April, Jeffrey filed a

---

[1] Unless otherwise stated, all section references are to the Code of Civil Procedure. Under section 474, discussed at length below, a plaintiff who is ignorant of the name of a defendant may designate that defendant by a fictitious name and then amend when the defendant's true name is discovered.

[2] Dr. Furst's entry in Jeffrey's file is that she struck the wheel "after seat belt failed." At his deposition, he testified that he could not remember whether those were her words or his, that the word "failed" might have been his and not hers, and that she might have said "the seat belt didn't hold [her]" or used some other words to the same effect. As he explained, he uses quotation marks when he is quoting a patient verbatim, and the comment in his notes about the seat belt is not in quotes. As he also explained, there is a possibility that Ron Jeffrey (Mrs. Jeffrey's husband, who was also interviewed by Dr. Furst but was not in the examining room when he interviewed Mrs. Jeffrey) was the one who mentioned the seat belt (although he probably would have noted it in his file if the information came from someone other than Jeffrey).

[3] Ron Jeffrey was also named as a plaintiff and he alleged a separate loss of consortium claim. Since his claim is entirely derivative, our subsequent references to "Jeffrey" include Mr. and Mrs. Jeffrey.

standard-form "Amendment to Complaint" adding General Motors Corporation as Doe 1. On May 19 (two and one-half years after the accident), Jeffrey filed a first amended complaint adding a products liability claim against GM, alleging that the Blazer's seat belt restraint system was defectively designed, and that GM knew it was defective but did nothing about it. A claim for punitive damages was also added.[4]

In August, GM (then unaware of Dr. Furst's notes) moved to quash service of Jeffrey's first amended complaint on the ground that Jeffrey must have known she had a potential claim against GM when the original complaint was filed because "a seat belt either restrains a person or it does not and this fact is known immediately after" an automobile accident. Jeffrey opposed the motion, explaining in her declaration that although she obviously knew the name of the manufacturer of her car at the time she filed her original complaint, she "had no knowledge of any defect in the vehicle or the seat belt system of the vehicle." Since that time, however, she "learned that the injury [she] suffered was an injury which was most likely suffered as a result of a defect in the design of the seat belt." She learned of this defect when Rowell (her new attorney) explained it to her and identified a "so-called 'comfort feature' in the seat belt" which allows "the belt to remain in a spooled out position whenever a driver leans forward, for example, to adjust the radio or to turn on the ignition. Once the driver leans forward the belt will not retract into a snug position when the driver leans back." She had "never noticed this condition prior to discussing this matter" with Rowell but, since that time, had become aware of it when she drove the Blazer.

Jeffrey's opposition was also supported by a declaration from Dunn explaining that he had examined the Blazer when he was first consulted by Jeffrey and that, to him, "there did not appear to be anything wrong with the passenger restraint system. Up until the time [he] discussed this matter with Mr. Rowell[, Dunn] was unaware of GM's 'comfort feature' and was completely unaware that this particular design could cause injuries such as occurred to Mrs. Jeffrey." A declaration by Rowell explained that he was involved in an unrelated matter involving "a claim that the identical 'comfort feature' " on a GM vehicle caused "head injuries in a similar manner to the allegations in this case." He had conducted substantial discovery in the other case and had learned of eight additional "comfort feature" cases pending against GM, all of which were subject to protective orders prohibiting disclosure of information about the alleged defects in GM's seat belt system. As a result, it "would be quite unusual for someone such as Mr. Dunn, who does not specialize in the products liability area, to have become aware of

---

[4]The same pleading adds Bob Smith BMW and Robert A. Smith, Inc., doing business as Bob Smith BMW, as Does 2 and 3. They are not parties to these writ proceedings.

the problems associated with the use of the 'comfort feature' design" in Jeffrey's vehicle. Implicit in Rowell's declaration is the conclusion that the average driver would be totally unaware of this problem.[5]

GM's motion to quash was denied, the court finding that Jeffrey was "not aware of any defect, design or otherwise, in the . . . occupant restraint system." GM then answered and conducted discovery, at which time it learned of Dr. Furst's examination of Jeffrey and the note in Dr. Furst's file about the seat belt "failure." GM asked Rowell to dismiss Jeffrey's case against GM in exchange for a waiver of costs and a release of GM's malicious prosecution claims. When Rowell refused, GM moved for summary judgment, contending Jeffrey's claims were barred because, at the time she filed her original complaint, Jeffrey and Dunn knew there was a problem with the seat belt and knew the identity of the car's manufacturer, and thus Jeffrey was not ignorant of GM's identity within the meaning of section 474. GM supported its motion with Dr. Furst's deposition testimony, his handwritten notes, and his report to Dunn. Jeffrey opposed the motion, relying on the declarations she had filed in opposition to GM's motion to quash and contending, again, that she was ignorant within the meaning of section 474 because she did not know the seat belt system was defective.[6] As Jeffrey explained to the trial court, her claims against GM are not based on an

---

[5]In general terms, this is the way Rowell describes the problem with the seat belt: "The shoulder belt incorporated a load limiter, known as a 'windowshade' device, or comfort feature, which allowed intentional or inadvertent introduction of slack into the seat belt. [GM] has never publicized this design problem with this system, nor did it ever recall the vehicle or request that owners, such as [Jeffrey], modify or change the belt. However, the comfort feature was removed from the design of subsequent models." Another time, Rowell described it this way: "GM manufactured a vehicle which contained a passenger restraint system which allowed the inadvertent introduction of slack into the shoulder harness, and which, as a result of the design of the seat (which, during the course of the rear-end impact first loaded and then unloaded, causing a 'diving board' effect, propelling the torso and head forward and around the restrained lap area), allowed the acceleration and rotation of [Jeffrey's] head to levels which can and do result in brain damage and cognitive deficits." It appears to us that the (alleged) problem is this: When the driver gets into the car, slack is present in the shoulder belt due to the absence of an automatic cancellation feature (the purpose of which is to automatically cancel whatever slack was in the belt before the driver entered the car). When the driver buckles herself into her seat, her movement causes the "windowshade" (comfort feature) to inadvertently set excess slack. Upon impact, the driver's upper torso is flung forward and the shoulder belt retractor fails to timely lock up, causing additional seat belt webbing to extend and cause more forward movement to the driver's head. We emphasize that these are allegations, not established facts.

[6]Jeffrey did not file a supplemental declaration denying that she said anything to Dr. Furst about the seat belt. Previously, however, she had (under oath) denied GM's request for an admission that she told Dr. Furst that the seat belt had not held her, and that denial was included in GM's moving papers. The bottom line is that Jeffrey flatly denies saying anything at all to Dr. Furst about the seat belt. For purposes of this opinion, however, we are assuming that she *did* say something to the effect that the shoulder strap did not hold her as tight as she would have thought it would. Otherwise, as Jeffrey pointed out in the trial court, the dispute about that foundational fact would by itself mean GM was not entitled to summary judgment.

allegation of a mechanical failure but rather on the allegedly defective design of the restraint system. The trial court denied GM's motion.[7]

GM then filed a petition for a writ of mandate, asking us to compel the trial court to grant summary judgment and framing the issues as (1) whether a plaintiff may rely upon the subsequent association of more experienced counsel to bring in a new defendant under section 474 notwithstanding that "there has been no discovery of new facts" as required by section 474; (2) whether "the inexperience and malpractice" of Jeffrey's first lawyer, "who effectively violate[d] [his] ethical obligation to not take cases [he was] unqualified to handle," is a legally justifiable excuse to avoid the requirements of section 474;[8] and (3) whether a Doe amendment can relate back to the date of the original complaint when it is "admittedly based upon the same basic facts (i.e. seat belt failure) which were admittedly known when the original complaint was filed." We issued an order to show cause, received opposition from Jeffrey, and heard argument (at which time we invited and later received further briefing). We now deny the petition.

## DISCUSSION

When a lawsuit is first initiated after the applicable period of limitations has expired and the plaintiff is entitled to claim the benefit of a

---

(§ 437c, subd. (c).) Given the facts of this case (a low to medium speed rear-end impact and a seat belt that did not break or come undone), we do not believe much is added by Jeffrey's alleged statement to Dr. Furst. In our view, the issue is whether a driver who is dutifully wearing a seat belt and nevertheless strikes her head against the steering wheel is to be charged with actual knowledge of the basic facts of a products liability claim based on a latent defect in the design of the restraint system. Whether she stated her subjective belief is immaterial, as is the fact that she might have been suspicious. (Pt. II.D., *post.*)

[7]GM contends Jeffrey's declaration denying any knowledge of a problem with the seat belt contradicted her prior admission (the reference is to her statements to Dr. Furst) and thus should be ignored. GM is mistaken. All the cases GM relies on deal with a subsequent declaration attempting to contradict prior *testimony or a prior statement under oath*, and they have nothing to do with a declaration contradicting a doctor's vague memory about where he got information contained in his notes. (E.g., *Preach* v. *Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451 [16 Cal.Rptr.2d 320].)

[8]This pejorative attack on Dunn is uncalled for. We find nothing in the record contradicting Rowell's assertion that the alleged defects in GM's seat belt system are known to only a few lawyers. It is one thing to state the well established rule that an attorney's mistake about the statute of limitations will not save his client's case (*Gutierrez* v. *Mofid* (1985) 39 Cal.3d 892, 898 [218 Cal.Rptr. 313, 705 P.2d 886]; *Miller* v. *Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177]), quite another to launch an ad hominem attack accusing an attorney of malpractice or unethical conduct by not knowing that which is unknowable by reason of protective orders obtained by GM. In a duty to discover case, there might be an argument that, upon receipt of Dr. Furst's report and its mention of the seat belt, Dunn should have retained an expert to examine the seat belt. Since this is *not* such a case, we will have no more to say about this purported issue. As we view this case, the only issue is whether, at the time she filed her original complaint, Jeffrey was ignorant of the facts giving her a cause of action against GM.

delayed discovery rule (that is, when for one reason or another the plaintiff is granted an extended period within which to file suit), the relevant inquiry is what the plaintiff *knew or, through the exercise of due diligence, reasonably could have discovered* at an earlier date. (See part I, *post.*)

But where, as here, a lawsuit is initiated within the applicable period of limitations against someone (that is, almost anyone at all) and the plaintiff has complied with section 474 by alleging the existence of unknown additional defendants, the relevant inquiry when the plaintiff seeks to substitute a real defendant for one sued fictitiously is *what facts the plaintiff actually knew* at the time the original complaint was filed. (See part II, *post.*)

In the trial court and here, GM talks in terms of what Jeffrey *should have known* at the time she filed her original complaint. As we will explain, that question is immaterial in this context and the only relevant inquiry is whether Jeffrey had actual knowledge of the basic facts giving rise to her claim against GM.

## I. *The Delayed Discovery Rule*

We begin by stating the delayed discovery rule GM asks us to apply in this case. Where no one related to the same injury has been sued within the applicable period of limitations (for example, where the plaintiff knows she has a medical problem but does not know her condition was caused by a defective drug), the statute of limitations begins to run "when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 [751 P.2d 923, 245 Cal.Rptr. 658].) Stated otherwise, the limitations period begins once the plaintiff has notice or information of circumstances about her injury and its negligent cause such as would put a reasonable person on inquiry. (*Id.* at p. 1109; *Gutierrez* v. *Mofid, supra,* 39 Cal.3d at pp. 896-897; *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 101 [132 Cal.Rptr. 657, 553 P.2d 1129].)

In the delayed discovery context, a "plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. *Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.*" (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1111, italics added; see also *Miller* v. *Bechtel Corp., supra,* 33 Cal.3d at p. 875; *Graham* v. *Hansen* (1982) 128 Cal.App.3d 965, 972-973 [180 Cal.Rptr. 604] [if a plaintiff believes because of injuries

she has suffered that someone has done something wrong, the statutory period begins].)

The problem with GM's reliance on these cases is that they have nothing to do with section 474.

## II. *The Section 474 Rules*

### A. *The Statute*

Section 474 was enacted in 1872 to replace a virtually identical provision enacted in 1851 as section 69 of the Practice Act (Hogan, *California's Unique Doe Defendant Practice: A Fiction Stranger Than Truth* (1977) 30 Stan.L.Rev. 51, 57, fn. 18, henceforth cited as *Doe Defendant Practice*). As enacted, section 474 provided: " 'When the plaintiff is ignorant of the name of the defendant, he must state that fact in the complaint, and such defendant may be designated in any pleading or proceeding by any name, and when his true name is discovered, the pleading or proceeding must be amended accordingly.' " (*Doe Defendant Practice, supra,* at p. 57, fn. 18; see also *Rosencrantz* v. *Rogers* (1871) 40 Cal. 489, 490-491, quoting section 69 of the Practice Act.)[9] In 1953, an amendment added special notice requirements relevant only to default judgments (Stats. 1953, ch. 1244, § 1, p. 2807), and a 1955 amendment made the statute applicable to proceedings commenced by affidavit as well as those commenced by a complaint (Stats. 1955, ch. 886, § 1, p. 1516). There have been no other amendments, which means that, for our purposes, the statute is the same now as it was in 1851.

Today, it is generally understood that when a complaint sets forth a cause of action against a defendant designated by a fictitious name because the plaintiff is genuinely ignorant of his name or identity, and his true name thereafter is discovered and substituted by amendment, he is considered a party to the action from its commencement so that the statute of limitations stops running as of the date the original complaint was filed. (*Optical Surplus, Inc.* v. *Superior Court* (1991) 228 Cal.App.3d 776, 783 [279 Cal.Rptr. 194].)[10]

---

[9]Section 69 of the Practice Act provided: " 'When the plaintiff is ignorant of the name of a defendant, such defendant may be designated in any pleading or proceeding by any name; and when his true name is discovered, the pleading or proceeding may be amended accordingly.' " (*Doe Defendant Practice, supra,* p. 57, fn. 18.)

[10]Although it may appear at first blush that section 474 gives a plaintiff greater rights than she would have if, in the first instance, she had failed to sue anyone, that is not necessarily so. A plaintiff who defers suit altogether may (under certain circumstances and subject to various outside limitations imposed by statute) wait years after the causative event to initiate her litigation. (See e.g., *Rose* v. *Fife* (1989) 207 Cal.App.3d 760, 768 [255 Cal.Rptr. 440].) In the

## B. *The Supreme Court's Early Views*

In 1871, the Supreme Court decided *Rosencrantz* v. *Rogers*, *supra*, 40 Cal. 489. In *Rosencrantz,* four plaintiffs filed suit in 1868 for ejectment and for the recovery of a tract of land. They named several real defendants and also listed several others by fictitious names, including "James Blue." (*Id.* at p. 491.) At some later point (we are not told when), the plaintiffs served Arnold Fuller, the administrator of the estate of William Olds, as "James Blue" but they did not "offer" to insert Fuller's name in the complaint as the defendant. (*Id.* at p. 492.) Fuller moved to set aside the summons and to have the case dismissed as to him, and the trial court granted his motion. The plaintiffs appealed but lost.

The Supreme Court quoted section 69 of the Practice Act, then added: "*This ignorance of the name must, of course, be real, and not feigned; it must not be willful ignorance, or such as might be removed by mere inquiry or a resort to means of information easily accessible.* [¶] By Section 39 [of the Practice Act] it is provided that the complaint shall contain 'the name of the parties to the action, plaintiff and defendant,' and this is the general rule. By Section 69 a plaintiff who is unable to comply with this general rule in this respect, and therefore exposed to possible loss by the mere misfortune of *not knowing or being able to learn* the name of his intended adversary, is permitted to designate him for the time being by some fictitious name, upon condition, however, that as soon as he learns his true name he will conform to the general rule laid down in Section 39, by inserting it in the plead-ing. . . .

"We see no error in the action of the [trial court] in the respect complained of. *The premises had been so long, notoriously and uninterruptedly occupied by the Olds family, father, mother and children in succession, and their*

section 474 context, however, once *one* defendant is sued, *all* fictitiously named defendants must be brought in within a maximum period of three years—because summons must be returned within three years of its issuance. (§ 583.210.) Moreover, as a result of various trial delay reduction programs and their enabling rules (Gov. Code, § 68600 et seq.; Super. Ct. Los Angeles County Rules, rule 7.0 et seq. [Court Rules Service (Daily J. Co.)]), the traditional three-year period of section 583.210 is little more than a fading memory—under current rules of practice, the plaintiff must return summons and dismiss all fictitiously served defendants within six months to one year (or at least show good cause why a little more time ought to be allowed to locate another defendant). As a practical matter, therefore, section 474 gives the plaintiff about one extra year, not the unlimited open-ended period of time GM (and the defendants in the reported cases) seem to think is an eternity or longer. (See *Munoz* v. *Purdy* (1979) 91 Cal.App.3d 942, 947 [154 Cal.Rptr. 472] [the statutory scheme involving sections 474 and 583.210 "has been a satisfactory compromise between the harsh effect on a plaintiff of the statute of limitations and the unfairness to a defendant of attempting to litigate a stale claim"].)

*tenants, that the plaintiffs must be held to have known who were the occu-*
*pants, for it was easy for them to have done so. They were much less difficult*
*of ascertainment than were the exterior lines of the tract sued for, and which*
*are given in the complaint by calls and distances." (Rosencrantz v. Rogers,*
*supra,* 40 Cal. at pp. 492-493, italics added.)

Fifteen years later, the Supreme Court decided *Irving* v. *Carpentier* (1886) 70 Cal. 23 [11 P. 391], a quiet title action. In *Irving*, the plaintiff filed suit in February 1882 against several named defendants and others whose names he did not know, one of whom he designated as "Tom Jones." In February 1883, the plaintiff served the Pacific Improvement Company as the party originally identified as "Tom Jones." (*Id.* at p. 23.) Pacific moved to dismiss "on the ground that the plaintiff had notice at the time of the commencement of the action that [Pacific] claimed an interest in the premises in controversy . . ." and submitted evidence that in February 1881, a deed transferring an "undivided two-thirds part of the lands" from one of the originally named defendants to Pacific "was recorded in the office of the county recorder" where the land was located. (*Id.* at p. 24.) Thus, claimed Pacific, had the plaintiff "exercised any care and diligence whatsoever in examining or searching the records of said county, he could and would have seen that the company claimed and held in fee-simple an undivided interest in said lands." (*Ibid.*)

In opposition, the plaintiff swore that, at the time the original complaint was filed, he did not know that Pacific "was the name of the defendant that claimed an interest in the property; that he knew some one did, but did not know the name, and therefore sued by a fictitious name;" that it was not until January 1883 that he learned that Pacific claimed an interest in the property; and that no person was in possession of the property when the action was brought. (*Irving* v. *Carpentier, supra,* 70 Cal. at p. 24.) The trial court granted Pacific's motion, set aside the service of summons, and dismissed Pacific from the case.

The Supreme Court reversed. After noting that section 474 permits a plaintiff to sue a defendant by a fictitious name " 'when the plaintiff is ignorant of the name of a defendant,' " and that the plaintiff "did make the averment" required by the statute, the court suggested the evidence of recordation merely showed that the plaintiff "failed to examine a certain book, which if he had examined would have afforded him some information.

His failure to examine tends to establish the fact of ignorance." (*Irving* v. *Carpentier, supra*, 70 Cal. at p. 25.)[11] The court continued:

"We know of no law which makes it the duty of a plaintiff to examine the records of a county recorder's office to find out names of parties defendant, the neglect of which will subject him to have the service of his summons set aside and the cause dismissed as to a person sued by a fictitious name, whose real name he might have found out by examining the record of deeds of the county in which the land embraced in the action is situated, when he has made the averment in the complaint required by the statute.

"*The statute above referred to is an enabling one, and should be so construed as to cure the evil it was designed to correct and advance the remedy. Persons are sometimes compelled to bring suits in haste. They have not time to ascertain the true names of parties to be made defendants.* The statute of limitations may, in a day from the time the preparation of the complaint is commenced, effect a bar. Sometimes there is no means readily accessible of ascertaining the true names. The statute above referred to was enacted to afford a remedy in such cases. *Should a plaintiff lose his right to have his case tried because of ignorance of the names of parties whom he has a right to sue, and as to whom he may have a good cause of action? How is the party sued by a name not his own injured? He loses no right by allowing a plaintiff to proceed as provided by the statute. He has every opportunity accorded to any other defendant to make his defense. He can demur or file his answer, and set up every defense which he is advised he can rely on.*

"[Pacific] likens this case to that of a party allowed to bring an action for relief on the ground of fraud, in which case the cause of action is not deemed to have accrued until the discovery by the party aggrieved of the facts constituting the fraud. *In construing this rule, it has always been held that a party discovers the fraud when by the use of reasonable diligence he might have ascertained the facts constituting the fraud. But the rule prescribed by the statute in this case is entirely different. It is when he is actually ignorant of a certain fact, not when he might by the use of reasonable diligence have discovered it. Whether his ignorance is from misfortune or negligence, he is alike ignorant, and this is all the statute requires. This is the true meaning of*

---

[11]Civil Code section 1213, enacted in 1872, provided then as now that every conveyance of real property recorded as prescribed by law "is constructive notice of the contents thereof to subsequent purchasers and mortgagees." In *Irving,* however, the Supreme Court said the recorded deed did not give the plaintiff constructive notice because Civil Code section 1213 imposes the consequences of such notice only on subsequent purchasers and mortgagees. (*Irving* v. *Carpentier, supra,* 70 Cal. at p. 25.) The opinion in *Irving* does not disclose the plaintiff's status, stating only that he filed an action to quiet title. Perhaps he was a donee or devisee.

*the statute. We adopt it the more readily because the party thus brought in as a defendant loses no rights by it."* (*Irving* v. *Carpentier, supra,* 70 Cal. at pp. 25-27, italics added.)

*Rosencrantz* v. *Rogers, supra,* 40 Cal. 489, is summarily distinguished by the Supreme Court in *Irving,* on the ground that the *Rosencrantz* complaint did not contain the averment of ignorance required by the statute and on the additional ground that, in *Rosencrantz,* there was actual and continued occupancy by the persons claiming the land. (*Irving* v. *Carpentier, supra,* 70 Cal. at p. 27.) Whatever the pleading problem might have been in *Rosencrantz,* it is clear that, by the time *Irving* was decided, the Supreme Court no longer cared for the language it had used in *Rosencrantz*—that the "ignorance" must not only be real and not feigned but must also not "be willful ignorance, or such as might be removed by mere inquiry or a resort to means of information easily accessible." (*Rosencrantz* v. *Rogers, supra,* 40 Cal. at p. 491.) In our view, *Rosencrantz* suggests a duty of inquiry that is flatly rejected by *Irving.* (*Irving* v. *Carpentier, supra,* 70 Cal. at pp. 25-26 ["[w]hether his ignorance is from misfortune or negligence, he is alike ignorant, and this is all the statute requires"].) Be that as it may, it is *Irving,* not *Rosencrantz,* that has been followed for over 100 years.

## C. *The Current View Is One of Liberal Construction*

 ▄▄ ██ ██ Whatever the judicial attitude toward section 474 might have been in the 19th Century, the Supreme Court and the Courts of Appeal of the 20th Century are uniform in their view that section 474 is to be liberally construed. (*Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 602-603 [15 Cal.Rptr. 817, 364 P.2d 681]; *Motor City Sales* v. *Superior Court* (1973) 31 Cal.App.3d 342, 345 [107 Cal.Rptr. 280]; *Barnes* v. *Wilson* (1974) 40 Cal.App.3d 199, 203 [114 Cal.Rptr. 839] [the purpose of section 474 is to enable a plaintiff to commence suit in time to avoid the bar of limitations where he is ignorant of the identity of the defendant and the statute should be liberally construed to accomplish that purpose]; *Streicher* v. *Tommy's Electric Co.* (1985) 164 Cal.App.3d 876, 882 [211 Cal.Rptr. 22]; *Barrows* v. *American Motors Corp.* (1983) 144 Cal.App.3d 1, 7 [192 Cal.Rptr. 380] ["the California courts have been very liberal in permitting the amendment of pleadings to bring in a defendant previously sued by fictitious name"].)[12]

██ In keeping with this liberal interpretation of section 474, it is now well established that even though the plaintiff knows of the existence of the

---

[12]As the court put it in *Olden* v. *Hatchell* (1984) 154 Cal.App.3d 1032, 1037 [201 Cal.Rptr. 715], "[t]he purpose of section 474 is to enable a plaintiff to avoid the bar of the statute of limitations when he is ignorant of the identity of the defendant. [Citations.] The statute must be liberally construed to that end. [Citations.] Such construction is supported by 'the policy

defendant sued by a fictitious name, and even though the plaintiff knows the defendant's actual identity (that is, his name), the plaintiff is "ignorant" within the meaning of the statute if he lacks knowledge of that person's connection with the case or with his injuries. (*Wallis* v. *Southern Pac. Transportation Co.* (1976) 61 Cal.App.3d 782, 786 [132 Cal.Rptr. 631]; *Oakes* v. *McCarthy Co.* (1968) 267 Cal.App.2d 231, 253 [73 Cal.Rptr. 127] [plaintiff knew soils engineer was involved but did not know his connection to earth compacting operation]; *Parker* v. *Robert E. McKee, Inc.* (1992) 3 Cal.App.4th 512, 518 [4 Cal.Rptr.2d 347] [even where a defendant is named in the original complaint by his true name, then dismissed because the plaintiff believed his capacity relieved him of liability, he may later be added (returned to the action) as a Doe defendant based on the plaintiff's discovery that he occupied a different legal capacity].)[13] The fact that the plaintiff had the means to obtain knowledge is irrelevant. (*Garrett* v. *Crown Coach Corp.* (1968) 259 Cal.App.2d 647, 650 [66 Cal.Rptr. 590].)

### D. *To Defeat a Claim of Ignorance, It Must Be Shown That the Plaintiff Had Actual Knowledge of the Basic Facts*

Ignorance of the *facts* giving rise to a cause of action is the "ignorance" required by section 474, and the pivotal question is, " 'did plaintiff know *facts?*' not 'did plaintiff know or believe that she had a cause of action based on those facts?' " (*Scherer* v. *Mark* (1976) 64 Cal.App.3d 834, 841 [135 Cal.Rptr. 90]; *Hazel* v. *Hewlett* (1988) 201 Cal.App.3d 1458, 1465 [247 Cal.Rptr. 723].) Although it is true that a plaintiff's ignorance of the defendant's name must be genuine (in good faith) and not feigned (*Streicher* v. *Tommy's Electric Co., supra*, 164 Cal.App.3d at p. 882; *Stephens* v. *Berry* (1967) 249 Cal.App.2d 474, 477 [57 Cal.Rptr. 505]) and that a plaintiff need not be aware of each and every detail concerning a person's involvement before the plaintiff loses his ignorance (*Dover* v. *Sadowinski* (1983) 147

---

favoring liberality in the amendment of pleadings to encourage litigating causes on their merits.' [Citations.] One commentator has described the judicial treatment which has been accorded the statute as 'the expansive interpretation given to section 474 throughout its history.' (Hogan, *California's Unique Doe Defendant Practice: A Fiction Stranger Than Truth* (1977) 30 Stan.L.Rev. 51, 76.)"

[13]Professor Hogan describes a similar case (*Johnson* v. *Goodyear Tire & Rubber Co.* (1963) 216 Cal.App.2d 133 [30 Cal.Rptr. 650] [where the manufacturer of parts of the car the plaintiff was driving at the time of an accident were added as Doe defendants after the Supreme Court "swept aside the metaphysics of the 'privity' concept and adopted strict liability for product injuries" in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 (27 Cal.Rptr. 697, 377 P.2d 897)]) in *Doe Defendant Practice, supra*, pages 67-69: "It is difficult to imagine a relation-back situation more extreme than that present in *Johnson*. Plaintiff knew the new parties' existence, conduct, identities, names, and whereabouts long before limitations expired. Yet the combination of plaintiff's ignorance that the law gave rise to a cause of action against these known parties for this known conduct and the fortuity of his timely suit against someone else enabled him to outflank their defense of limitations."

Cal.App.3d 113, 117-118 [194 Cal.Rptr. 866]; *Optical Surplus, Inc.* v. *Superior Court*, *supra*, 228 Cal.App.3d at p. 784), it is equally true that the plaintiff does not relinquish her rights under section 474 simply because she has a suspicion of wrongdoing arising from one or more facts she does know. (*Garrett* v. *Crown Coach Corp.*, *supra*, 259 Cal.App.2d at p. 650; *Breceda* v. *Gamsby* (1968) 267 Cal.App.2d 167, 175-176 [72 Cal.Rptr. 832] [a plaintiff is entitled to the benefits of section 474 unless substantial evidence shows she was not ignorant of the facts she needed to know].)

■ The distinction between "actual facts" and "mere suspicion" was addressed in *Dieckmann* v. *Superior Court* (1985) 175 Cal.App.3d 345 [220 Cal.Rptr. 602]: "Section 474 allows a plaintiff in good faith to delay suing particular persons as named defendants *until he has knowledge of sufficient facts to cause a reasonable person to believe liability is probable.* The distinction between a suspicion that some cause *could exist* and a factual basis to believe a cause *exists* is critical in the operation of section 474. The former is one reason attorneys include general charging allegations against fictitiously named defendants; the latter requires substitution of the defendant's true name. [The late named defendant's] present urging that its ostensible liability was always obvious to plaintiff confuses these two standards of knowledge and is based upon hindsight." (*Dieckmann* v. *Superior Court*, *supra*, 175 Cal.App.3d at p. 363, italics added.)[14]

Thus, for example, in *Streicher* v. *Tommy's Electric Co.*, *supra*, 164 Cal.App.3d 876, a plaintiff sued the general contractor, a subcontractor and several fictitiously named defendants for negligently causing the injuries he sustained when a radio-controlled overhead garage door opened unexpectedly, causing him to fall from scaffolding where he was working. (*Id.* at pp. 879-880.) Two years and ten months later, the plaintiff amended his complaint to add the manufacturer of the door opener and allegations that the opener was defectively designed. Although the plaintiff knew the door had opened and knew it was radio-controlled, his amendment was proper because he "did not know at [the time he filed his original complaint] any facts which would indicate the possibility that the door openers were defectively

---

[14]We note that a plaintiff bringing in a new defendant after the statute of limitations has run must, at the same time she is required to show her ignorance, also show that her new claim is based on "the same general set of facts" as alleged in the original complaint—or risk a pyrrhic victory where she gets to bring in her new defendant but loses her right to have her claim relate back to the time the original complaint was filed. (See e.g., *Barnes* v. *Wilson*, *supra*, 40 Cal.App.3d at p. 204.) In a case before us, there is no relation back problem. (*Barrows* v. *American Motors Corp.*, *supra*, 144 Cal.App.3d at p. 7 [when standard Doe allegations are included in complaint against the driver of a vehicle, a product liability claim against the manufacturer of a vehicle involved in the same accident relates back because it is based on the same accident and the same injury]; *Olson* v. *Volkswagen of America* (1988) 201 Cal.App.3d 1437, 1440, 1142-1443 [247 Cal.Rptr. 719].)

designed as *such flaw in design was not externally visible.*" (*Id.* at p. 883, italics added.)

In short, section 474 does not impose upon the plaintiff a duty to go in search of facts she does not actually have at the time she files her original pleading.[15] (*Munoz* v. *Purdy, supra,* 91 Cal.App.3d at pp. 947-948 ["the interjection of a discovery standard into section 474 would lead to the harmful practice in all litigation of requiring that all persons who might conceivably have some connection with the lawsuit be specifically named in order to avoid the sanctions of the failure to comply with the inquiry requirements of section 474"].)

## III.

Construed in GM's favor, the evidence is that Jeffrey "knew" the seat belt "failed" and "knew" she hit her head on the steering wheel. Construed in Jeffrey's favor, the evidence is that she gave no thought at all to the seat belt (except for her knowledge that she was wearing it at the time of the collision and that it did not break or come undone) but she did "know" that her head hit the steering wheel. As noted above (fn. 6, *ante*), the focus on whether she knew the belt "failed" is a red herring. Given a driver wearing a seat belt when her car is rear-ended by another car traveling at low or moderate speed, given the fact that the seat belt did not break or come

---

[15]We are not the first court to refuse to impose a duty of inquiry under section 474. (See (*Streicher* v. *Tommy's Electric Co., supra,* 164 Cal.App.3d at p. 883; *Garrett* v. *Crown Coach Corp., supra,* 259 Cal.App.2d at p. 650; *Breceda* v. *Gamsby, supra,* 267 Cal.App.2d at p. 174 [the fact that the plaintiff had the means of ascertaining the needed facts earlier is not a bar to the application of section 474]; *Mishalow* v. *Horwald* (1964) 231 Cal.App.2d 517, 523-524 [41 Cal.Rptr. 895] ["whether plaintiffs could or could not have ascertained the [necessary facts] before suit was filed is immaterial"]; *Larson* v. *Barnett* (1950) 101 Cal.App.2d 282, 289-290 [225 P.2d 297]; *Johnson* v. *Goodyear Tire & Rubber Co., supra,* 216 Cal.App.2d at p. 139; *Marasco* v. *Wadsworth* (1978) 21 Cal.3d 82, 88 [145 Cal.Rptr. 843, 578 P.2d 90]; *Snoke* v. *Bolen* (1991) 235 Cal.App.3d 1427, 1432 [1 Cal.Rptr.2d 492] [the plaintiff is not required to exercise reasonable diligence prior to filing the complaint to discover the defendant's identity or the facts giving rise to a cause of action]; *Westfour Corp.* v. *California First Bank* (1992) 3 Cal.App.4th 1554, 1560 [5 Cal.Rptr.2d 394]; *Balon* v. *Drost* (1993) 20 Cal.App.4th 483, 490 [25 Cal.Rptr.2d 12] [even where it was known to the plaintiff that the driver was not the owner of the car and the driver gave the plaintiff the owner's name immediately after the accident, the fact that the plaintiff forgot the name because she was dazed means she was ignorant of the name of the owner because these facts simply "demonstrate[] carelessness, not a willful misuse of section 474"]; *Sobeck & Associates, Inc.* v. *B & R Investments No. 24* (1989) 215 Cal.App.3d 861, 867 [264 Cal.Rptr. 156] [there is no requirement that the plaintiff exercise diligence to discover the identity of the defendant after filing the complaint]; *Joslin* v. *H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 376 [228 Cal.Rptr. 878] [there is no requirement that a plaintiff exercise reasonable diligence in discovering either the true identity of fictitious defendants or the facts giving him a cause of action against such persons].)

undone, and given the fact that the driver hit her head on the steering wheel, *the ultimate issue is whether Jeffrey had actual knowledge of the basic facts giving her a claim against GM*. Our resolution of this issue in favor of Jeffrey is based on the following analysis.

*First*, we begin by identifying the theory of Jeffrey's claim against GM as one for products liability. (*Breceda* v. *Gamsby, supra*, 267 Cal.App.2d at p. 177 [for purposes of section 474, the plaintiff's knowledge must be tested in the context of the theory of her claim against the new defendant].)

*Second*, we consider what facts Jeffrey must show to have a viable products liability claim against GM (*Dieckmann* v. *Superior Court, supra*, 175 Cal.App.3d at p. 363 [under section 474, a plaintiff is not required to sue "until [s]he has knowledge of sufficient facts to cause a reasonable person to believe liability is probable"]), and note that, to prevail, she ultimately will have to prove that (a) GM was the manufacturer, (b) the seat belt system possessed a defect in design, (c) the defective design existed at the time the car left GM's possession, and (d) the defective design was a cause of her injury or enhanced the injury caused by the collision. (BAJI No. 9.00.5; *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 560 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

*Third,* we consider the means by which Jeffrey would prove her products liability claim against GM. In this regard, the essence of GM's position is that "a seat belt either restrains a person or it does not and this fact is known immediately after" an automobile accident, an argument we understand to mean that the seat belt's alleged failure is a matter so "commonly understood" by those who use it that a jury could decide this case without benefit of expert testimony. (Cf. *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]; *Soule* v. *General Motors Corp., supra*, 8 Cal.4th at p. 567.) We flatly reject GM's "commonly understood" argument. Whatever merit there might be to GM's position in a case where a passenger is not wearing a seat belt (*McNeil* v. *Yellow Cab Co.* (1978) 85 Cal.App.3d 116, 118-119 [147 Cal.Rptr. 733]; *Twohig* v. *Briner* (1985) 168 Cal.App.3d 1102, 1107 [214 Cal.Rptr. 729]), we cannot agree that it is "commonly understood" that a driver wearing a seat belt will hit her head on the steering wheel when her car is rear-ended only if there was something wrong with the seat belt. To the contrary, we believe that where, as here, the alleged defect "was not externally visible" (*Streicher* v. *Tommy's Electric Co., supra*, 164 Cal.App.3d at p. 883), it cannot be said that Jeffrey had actual knowledge of any fact or circumstance suggesting a defect in the manner in which the belt was designed. (Cf. *Endicott* v. *Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 926 [141 Cal.Rptr. 95, 9 A.L.R.4th 481];

*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 124-125 [184 Cal.Rptr. 891, 649 P.2d 224] [suggesting the determination whether "a seatbelt is helpful when a person is in a vehicle, which is moving at 40 miles per hour, and is involved in a serious collision" requires expert testimony]; *Truman* v. *Vargas* (1969) 275 Cal.App.2d 976, 982 [80 Cal.Rptr. 373].) Whatever merit there may be to a claim that someone who is *not wearing* a seat belt knows, as a matter of "common knowledge," that her conduct contributed to her injuries, that is not what happened here. (See *McNeil* v. *Yellow Cab Co., supra*, 85 Cal.App.3d at pp. 118-119.)[16]

*Fourth,* GM's own expert has testified that a properly operating seat belt (one with "no slack") would *not* have prevented Jeffrey from striking her head on the steering wheel. The way we understand the evidence in the record now before us, the purpose of a seat belt is to reduce (not eliminate) the number of accidents in which a driver's or passenger's head strikes the interior of the vehicle by reducing the speed of head travel and the corresponding severity of head impact.

Based upon the testimony of GM's expert and on our conclusion that such matters are not within the average driver's "common knowledge," we hold that a driver who is injured in an automobile accident when she is wearing a seat belt which appears to the naked eye to have operated in its intended fashion does not know the basic facts she needs to plead a products liability claim against the manufacturer of the seat belt. (Evid. Code, § 452, subd. (g) [judicial notice may be taken only of those "[f]acts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute"]; *Dieckmann* v. *Superior Court, supra*, 175 Cal.App.3d at p. 362 [plaintiff's knowledge of (a) the identity of a truck's manufacturer and (b) the fact that, for no apparent reason, the truck's driveshaft dislodged while the truck was moving does not constitute sufficient cause to require plaintiff to sue the truck's manufacturer in his original complaint].) It follows that when she subsequently learns that the seat belt may have been defectively designed, she is entitled to claim the

---

[16]In spite of its "commonly understood" argument, GM contends it is irrelevant that Jeffrey would need an expert to prove at least two elements of her claim (that the design is, in fact, defective, and that, if it is, the defect enhanced her injuries). (*Truman* v. *Vargas, supra*, 275 Cal.App.2d at p. 982.) This is so, according to GM, because a plaintiff in a medical malpractice action may be charged with knowledge for section 474 purposes notwithstanding the need for expert testimony to prove professional negligence. (*Dover* v. *Sadowinski, supra*, 147 Cal.App.3d 113; *Hazel* v. *Hewlett, supra*, 201 Cal.App.3d 1458; *Scherer* v. *Mark, supra*, 64 Cal.App.3d 834.) The medical malpractice cases in which a plaintiff has been charged with knowledge of facts sufficient to defeat reliance on section 474 all involve facts akin to the no-seat-belt cases (a patent problem), not this case (a latent problem).

benefits of section 474. (*Breceda* v. *Gamsby*, *supra*, 267 Cal.App.2d at p. 179.)[17]

## DISPOSITION

The orders to show cause are discharged and the petitions are denied.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied September 5, 1996, and the opinion was modified to read as printed above. Petitioner's application for review by the Supreme Court was denied November 13, 1996.

---

[17]While this writ petition was pending (and no stay was in effect), GM moved for summary judgment on a different ground—that section 474 does not apply because the claim against it involves a different instrumentality (Jeffrey's car) than the original complaint (the car that hit her). That motion was denied and GM filed another petition for a writ of mandate. To avoid confusion, we issued an order to show cause and consolidated GM's petitions. We do not reach the merits of the second petition and dismiss the order to show cause.