[No. B175408. Second Dist., Div. One. Nov. 30, 2005.]

CHERYL LYNN STEPHEN, Plaintiff and Appellant, v.
FORD MOTOR COMPANY et al., Defendants and Respondents.

1364

COUNSEL

Mitchell McKay; Peters & Peters and Barbara J. Peters for Plaintiff and Appellant.

Snell & Wilmer, Richard A. Derevan and Michael S. McIntosh for Defendant and Respondent Ford Motor Company.

Iverson, Yoakum, Papiano & Hatch, Arnold D. Larson, John A. Slezak and Mary P. Lightfoot for Defendant and Respondent Bridgestone/Firestone North American Tire, LLC.

## OPINION

**VOGEL, J.**—Cheryl Lynn Stephen was injured in a single-vehicle accident when the tread separated from the right rear tire of her Ford Explorer. The Explorer was towed to a scrap yard, where an insurance adjuster took a few snapshots of the vehicle to establish that it was a total loss, and where Stephen's boyfriend took a few Polaroid pictures of the car when he and Stephen went to collect her personal belongings. The Explorer was then sold for scrap and the tire discarded. About a year later, Stephen sued Ford Motor Company and Bridgestone/Firestone North American Tire, LLC for damages, alleging the tire and the vehicle were defectively designed. At trial, the court excluded the testimony of Stephen's tire expert, substantially limited the testimony of her directional stability expert, then granted Ford's and Firestone's motions for nonsuit. Stephen appeals, challenging the evidentiary rulings and the nonsuits based on those rulings. We hold that expert testimony was necessary to establish Stephen's claims against both Ford and Firestone, that the tire expert's testimony was properly excluded because there was no foundation for his opinions or conclusions, and that the directional stability expert's testimony was properly limited for precisely the same reason. We affirm the judgment.

## FACTS

### A.

In August 1998, Cheryl Stephen's family purchased a used 1996 Ford Explorer. On September 29, 1999, Stephen felt a vibration, then lost control of the Explorer, which crashed into the center divider of the 91 Freeway, then rolled over. A California Highway Patrol officer who arrived shortly after the

accident reported that the Explorer's right rear tire was "still inflated" but that its tread was "completely gone" (that is, it had detreaded, which means it had separated from the tire).[1] Although the front tires on the Explorer had been replaced about a month before the accident, the rear tires were the Firestone Radial ATX's that were on the vehicle at the time of its original sale by Ford. At the time of the accident, the Explorer had been driven about 58,700 miles.

Stephen's insurer had the Explorer towed to a salvage company for storage. In early October, an adjuster took photographs of the Explorer to substantiate Stephen's claim, then declared the vehicle a "total loss." About the same time, Stephen and her boyfriend went to the salvage yard to retrieve some CD's from the Explorer, and her boyfriend took some Polaroid photographs of the vehicle, some of which show that the right rear tire was still on the Explorer at that time. Both sets of photographs are amateurish, and none of the pictures are anything like those that would be taken by a tire expert documenting an inspection. In mid-October, the Explorer was scrapped and sold for salvage, and the tire was discarded

## B.

In September 2000, Stephen sued Ford Motor Company and Bridgestone/Firestone North American Tire, LLC, alleging that the Explorer was defectively designed by Ford, that the tire was defectively designed by Firestone, and that both Ford and Firestone were negligent.[2] Ford and Firestone answered, discovery ensued, and the case was tried in February and March 2004.

Ford and Firestone each filed motions in limine to exclude testimony by Stephen's experts, and a series of Evidence Code section 402 hearings were held to determine the admissibility of various opinions by H. R. Baumgardner (Stephen's tire expert) and David Renfroe (Stephen's vehicle stability expert).[3] Ultimately, the trial court (for reasons discussed at length *post*) excluded Baumgardner's testimony in its entirety and imposed significant limitations on the scope of Renfroe's testimony.

---

[1] The record includes various terms for this separation, such as "detreading," "tread separation," and "belt-leaving-belt-tread separation failures." For the most part, we use the term "tread separation" because it is sufficiently technical for our purposes.

[2] Stephen's lawsuit was filed in the Orange County Superior Court, then transferred to the Los Angeles Superior Court and assigned to the Judicial Council Coordination Proceeding for Firestone Tire Cases (Super. Ct. L.A. County, No. JCCP4160).

[3] All section references are to the Evidence Code.

Stephen proceeded to put on the remnants of her case, at the conclusion of which Ford's and Firestone's motions for nonsuit were granted. The court found Stephen had failed to present a prima facie case of negligence or strict liability vis-à-vis Firestone because she did not have any expert testimony to show the tire failed as the result of a design defect, and that Stephen had failed to present a prima facie case of negligence or strict liability vis-à-vis Ford because the evidence did not show the applicable standard of care or that Ford fell below it, or that the design of the Explorer was a substantial factor in causing her injuries, or that the design presented a substantial risk of harm, or that there were feasible alternative designs.

Stephen appeals from the judgment in favor of Firestone and Ford.

## DISCUSSION

### I.

Stephen contends the issues about Baumgardner's testimony go to its weight, not its admissibility, that the trial court should not have excluded his testimony, and that the nonsuit in favor of Firestone cannot stand. We disagree.

### A.

#### Baumgardner's Testimony at the Section 402 Hearing

Stephen's theory is that the tread separated from her right rear tire because this tire, like all Radial ATX size P235/75R15 tires made by Firestone between 1990 and 1996, was defective. According to Baumgardner, there was an increase in the number of Firestone Radial ATX tire failures beginning with tires manufactured during 1990, and the failures peaked with tires manufactured during 1995 and 1996 (Firestone recalled all of its Radial ATX tires in 2000, after Stephen's accident). The defect, according to Baumgardner, was that "the rubber skim stock" between the inner and outer radial steel belts was of insufficient strength to hold the tire together when the vehicle was moving at high speed. He said there was a weakness in the "peel strength," which occurred, he said, because there was excessive sulfur in the "skim rubber recipe" Firestone used in manufacturing its tires. Because of this "systematic design defect" and based on his examination of the amateur

photographs of Stephen's tire, Baumgardner concluded that Stephen's tire had failed due to the design defect inherent in Firestone's Radial ATX tires.[4] There were a number of problems with Baumgardner's testimony.

Qualifications. Although he is a "tire engineer" who worked for Firestone for 27 years designing "bias ply" tires and performing "tire failure analyses" in the company's "retread division," Baumgardner did not work on Firestone's Radial ATX's or on any "steel belted radial tires." He retired from Firestone in 1982 and since that time has worked as a consultant. He is not a chemist (he has no background in rubber chemistry or rubber compounding), and he is not a licensed engineer (he has a bachelor's degree in industrial design).

Scientific Theory. Baumgardner's sulfur-related testimony was based on his review of work by other experts, and his design defect opinion was formed, he said, using a "Kepner-Tregoe" analysis, a technique based on the compilation, evaluation, and continuous refining of data (for example, the number of occurrences or trends, the time of occurrences, and similar bits of information from other supposedly similar tire failures). Baumgardner conceded that the Kepner-Tregoe method requires empirical testing to confirm the conclusions reached from an examination of the data, and admitted that no tests were done by him or anyone else on Stephen's tire (which had been discarded before this case was filed) or on any similar tire. Baumgardner conceded that he did not know of anyone using the Kepner-Tregoe analysis for forensic tire evaluation, that he himself had never used the analysis in any prior case, and that he was not aware of any peer review publication approving the Kepner-Tregoe analysis for that use.

The Amateur Photographs. Baumgardner used the amateur photographs as a substitute for testing. Although he did not know what kind of camera or lens had been used to take either set of photographs, and although he could only guess at the distance at which the photographs were taken (six to 10 feet), and although the photographs did not show the size of the tire or its "D.O.T." number (which would have shown the date and place it was manufactured), Baumgardner testified that he nevertheless found the photographs sufficiently detailed to support his conclusion that the "failure was in

---

[4] In her opening brief, Stephen contends Baumgardner also testified that "cap plies" (belt edge strips that run around the tire to hold the belt down and prevent separation) would have prevented the accident. The record shows otherwise. Referring to a Uniroyal tire with cap plies, Baumgardner testified, "I have never said they prevent [tread detachment]." "It is not a cure all."

the middle of the rubber." As for his inability to determine the time of manufacture, Baumgardner said he "assumed" that, because the tire was on a 1996 Explorer, it was manufactured during 1995 or 1996.

The photographs (which we have examined) do not show the interior of the tire or the inside sidewall, and Baumgardner testified that he could see only 80 percent of the "outside" wall and "none of the inside." There are no photographs of the tread belt piece that detached from the tire. In response to a hypothetical question, Baumgardner admitted that, had he been shown similar photographs of a different manufacturer's tire, he would not have been able to opine with a reasonable degree of engineering certainty about the reason why the tread came off the tire or whether there was a manufacturing or design defect when the tire left the manufacturer's plan, and that it was only because he knew Stephen's tire was a Firestone tire that he considered the photographs sufficient to support his conclusion about this tire's failure.

Baumgardner conceded that he had never before testified that a tire was defective without first examining the tire itself, and he agreed that the photographs were insufficient to rule out other causes of failure, such as whether the tread detachment was service-related, or impact-related, or a result of under-inflation, overloading, mounting damage, or wear. He admitted that his usual practice is to inspect the tire surfaces from a distance of inches, not feet, using bright lights and magnifiers.

Foundational Facts. In making his Kepner-Tregoe analysis, Baumgardner relied upon conclusions he said were drawn from data compiled from similar tire failures but he did not produce the compiled data, only selected portions from 10 previous tire failures he had analyzed. He did not remember the circumstances of the prior failures or when they occurred or the age of the failed tires, and he did not produce the accident reports for those failures. Of the 10 failed tires he described, only three were Firestone Radial ATX tires, and Baumgardner had no information about whether those tires were manufactured at the same plant as Stephen's tire or during the same year. None of the 10 tires were "pretty well worn out" (as Baumgardner described Stephen's tire).

Although Baumgardner opined that all of Firestone's Radial ATX tires were defectively designed, he conceded that not all of the tires were in fact defective—and he admitted that he had "turned away" at least 10 cases involving Firestone Radial ATX tire failures after determining that the tires

had failed due to causes unrelated to the design defect. He admitted that "the vast majority of these tires did not fail" (less than 1 percent of the tires subject to the recall had experienced tread belt detachment problems).

After extensive briefing and several hearings about the admissibility of Baumgardner's testimony, the trial court granted Firestone's motion to exclude the testimony in its entirety on the grounds, among others, that the other accidents he relied on to form his opinion were insufficiently similar to support his conclusions, that the amateur photographs were unreliable, and that his opinions were too speculative because he had no basis for his conclusion that it was more likely than not that the detachment was caused by a defect rather than some other factor.

## B.

### The Testimony Was Properly Excluded[5]

To prove her case against Firestone, Stephen had to present substantial evidence that Firestone manufactured the tire, that the tire was defective in its manufacture or design, that the defect existed when the tire left Firestone's possession, that the defect was the cause of Stephen's injury, and that Stephen's injury was caused by a use of the tire that was reasonably foreseeable to Firestone. (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 676 [117 Cal.Rptr. 1, 527 P.2d 353]; *Barrett v. Atlas Powder Co.* (1978) 86 Cal.App.3d 560, 564 [150 Cal.Rptr. 339] [the defect must be affirmatively established, and a mere inference of defect is insufficient].)[6] The causation

---

[5] To the extent the trial court excluded the testimony on the ground that there was no reasonable basis for Baumgardner's opinion, we review the ruling for abused discretion; to the extent the trial court's ruling is based on conclusions of law, we review those conclusions de novo. (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 563–564 [115 Cal.App.4th 621, 10 Cal.Rptr.3d 34]; *People v. Johnson* (1993) 19 Cal.App.4th 778, 790 [23 Cal.Rptr.2d 703].)

[6] Stephen contends she may prove her design defect claims by reliance on the consumer expectations test described in *McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111 [123 Cal.Rptr.2d 303]—that is, that she is entitled to prove by circumstantial evidence that there was a design defect because the tire and the vehicle performed below the standard expected by an ordinary consumer when a product is used in a reasonably foreseeable manner. The trial court disagreed and so do we. The consumer expectation test applies only when the defect can be determined by common knowledge regarding minimum safety expectations, not where (as here) an expert must balance the benefits of design against the risk of danger. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443]; *Pruitt v. General Motors Corp.* (1999) 72 Cal.App.4th 1480, 1483 [86 Cal.Rptr.2d 4]; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567–570 [34 Cal.Rptr.2d 607, 882 P.2d 298] [the consumer expectations test does not apply when the plaintiff's theory of design defect is one of technical and mechanical detail regarding obscure components of a vehicle or complex circumstances of an accident].)

element is the same with regard to Stephen's negligence claim. (*Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1837, 1846–1847 [20 Cal.Rptr.2d 913].)

As we have explained, Stephen's tire was not examined by Baumgardner or anyone else, and no forensic photographs were taken, which meant Baumgardner relied on supposedly similar tire failures and the amateur photographs taken by the insurance adjuster and Stephen's boyfriend. The problem is that Stephen failed to show there was substantial similarity between the tire failures relied on by Baumgardner and her tire failure, and she failed to establish that the amateur photographs were sufficient to support Baumgardner's conclusions. As a result, Baumgardner's opinions and conclusions were mere speculation. (*Lockheed Litigation Cases, supra,* 115 Cal.App.4th at p. 564 [the matter relied on by an expert must provide a reasonable basis for his opinion, and opinions based on speculation or conjecture are not admissible]; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 [234 Cal.Rptr. 630] [an expert cannot base his opinions on assumptions that are not supported by the record, or upon information that is not reasonably relied upon by other experts]; *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487 [50 Cal.Rptr.2d 785] [a possible cause of an injury only becomes probable when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action]; *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118 [8 Cal.Rptr.3d 363] [a theoretical possibility of causation cannot support an expert's conclusion that the act in question was the cause of the injury].)

### 1.

We agree with Stephen that evidence of substantially similar tire-failure accidents would be admissible to prove that Stephen's tire failure accident occurred in the same manner (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171]) but disagree with her contention that the other tire failures relied on by Baumgardner were sufficiently similar to the failure of Stephen's tire to provide a foundation for Baumgardner's opinion. The trial court's finding of insufficient similarity was one made in an exercise of its discretion, and that decision will not be disturbed where, as here, the record supports the finding and does not show abused discretion. (*Kopfinger v. Grand Central Pub. Market* (1964) 60 Cal.2d 852, 860–861 [37 Cal.Rptr. 65, 389 P.2d 529]; *Ault v. International Harvester Co.* (1974) 13 Cal.3d 113, 121–122 [117 Cal.Rptr. 812, 528 P.2d 1148].)

Baumgardner testified that he had worked on about 300 Firestone tire failure cases but he based his similar accident testimony on only 10 of those cases, and he did not provide the sort of information that would support a finding of substantial similarity. He did not provide police reports from the other accidents or any other information to show that the circumstances of the 10 tire failures were similar to the circumstances of this case. He conceded that only three of the 10 cases involved Firestone Radial ATX tires and that, in two of those three cases, the tires had been manufactured in 1993, not 1995 or 1996 (when Stephen's tire was manufactured). He conceded that none of the 10 tires were nearly as worn as Stephen's tire.

Although Stephen submitted further similarity information in posthearing briefing on that issue, the additional data did not fill the gap. Baumgardner offered a list of 96 tire failures in which he had personally examined Firestone Radial ATX tires, but he once again omitted the details that would show similarity—there were still no police reports or other details about the age or condition of the tires or the circumstances of the failures. (*Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 555 [208 Cal.Rptr. 874, 691 P.2d 630]; *Brake v. Beech Aircraft Corp.* (1986) 184 Cal.App.3d 930, 937–938 [229 Cal.Rptr. 336].)

**2.**

The amateur photographs were not a substitute for a tire examination and they could not properly provide a basis for Baumgardner's opinion. As Baumgardner conceded, experts generally conduct visual and tactile examinations of failed tires to determine the cause of the failure and, at the same time, to rule out other possible causes. (See *Kumho Tire Co. v. Carmichael* (1999) 526 U.S. 137, 153–154 [143 L.Ed.2d 238, 119 S.Ct. 1167].) As Baumgardner also conceded, he has never before rendered an expert opinion based on photographs, and he does not know of anyone else who has done so. For her part, Stephens has not offered any citation to any type of case in which an amateur photograph has been used to support an expert's opinion in any type of case, let alone a case of this nature, and we know of no such authority. To the contrary, the authority we have found supports the trial court's ruling. (E.g., *Triton Energy Corp. v. Square D Co.* (9th Cir. 1995) 68 F.3d 1216 [summary judgment proper in a product liability case when plaintiff's experts had not seen the allegedly defective product]; *Brown v. Parker-Hannifin Corp.* (5th Cir. 1990) 919 F.2d 308 [directed verdict for defense proper where plaintiff's expert had never examined failed product and thus could not rule out other possible causes of failure].)

## 3.

These problems do not go to the weight of Baumgardner's testimony. Because his opinions and conclusions were nothing more than speculation, his testimony could not constitute substantial evidence in support of a verdict in Stephen's favor, and it is for this reason that the trial court correctly excluded the testimony in its entirety. (*Lockheed Litigation Cases, supra,* 115 Cal.App.4th at p. 564; *Leslie G. v. Perry & Associates, supra,* 43 Cal.App.4th at p. 487.)[7]

## C.

■ It follows that Firestone's motion for nonsuit was properly granted. A product liability case must be based on substantial evidence establishing both the defect and causation (a substantial probability that the design defect, and not something else, caused the plaintiff's injury) and where, as here, the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation. (*Dimond v. Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 177 [134 Cal.Rptr. 895]; *McGee v. Cessna Aircraft Co.* (1983) 139 Cal.App.3d 179, 187–188 [188 Cal.Rptr. 542]; *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 124 [184 Cal.Rptr. 891, 649 P.2d 224]; *General Motors Corp. v. Superior Court* (1996) 48 Cal.App.4th 580, 597 [55 Cal.Rptr.2d 871]; *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 694–696 [11 Cal.Rptr.3d 807]; *Galanek v. Wismar* (1999) 68 Cal.App.4th 1417, 1427 [81 Cal.Rptr.2d 236]; *Leslie G. v. Perry & Associates, supra,* 43 Cal.App.4th at p. 484.)

■ Stephen's theory about the tire failure is based on the tire's chemical characteristics and the supposedly defective "recipe" used by Firestone in the manufacturing process—a theory plainly beyond the common experience of both judges and jurors. It follows that Stephen's inability to present expert testimony was fatal to her product liability and negligence claims, and that

---

[7] Stephen's other arguments are unsupported by the record or the law she relies on. To the extent she claims Baumgardner's testimony about other failures was admissible to show that Firestone was on notice of a defect before 1999 and had a duty to warn about that defect, that theory was not advanced below. To the extent Stephen relies on *Mosesian v. Penwalt Corp.* (1987) 191 Cal.App.3d 851 [236 Cal.Rptr. 778] to support her claim that these issues go to the weight of the evidence, not its admissibility, the case is inapposite because the issue there was one expert's reliance on another expert's testimony, and it was in that context the court discussed weight rather than admissibility. To the extent Stephen contends the recall notice supports her claims, she misses the point; the recall notice may show notice of the existence of a defect in design, but it has nothing to do with whether Stephen's tire failed as a result of that defect.

nonsuit was proper. (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456]; *Helm v. K.O.G. Alarm Co.* (1992) 4 Cal.App.4th 194, 198, fn. 1 [5 Cal.Rptr.2d 615]; *Truman v. Vargas* (1969) 275 Cal.App.2d 976, 982–983 [80 Cal.Rptr. 373] [expert testimony legally necessary when nonexpert could only guess about causation]; *Campbell v. General Motors Corp., supra,* 32 Cal.3d at p. 124; *General Motors Corp. v. Superior Court, supra,* 48 Cal.App.4th at pp. 597–598, fn. 16.)

## II.

Stephen contends the trial court imposed erroneous limitations on Renfroe's testimony, and that the nonsuit in favor of Ford cannot stand. We disagree.

## A.

### Renfroe's Testimony at the Section 402 Hearing

Renfroe (who was Stephen's only expert on the issues of vehicle control and directional stability) testified that a tread detachment will cause a vehicle to "hop," "tramp," and "skate" and to become an "oversteer vehicle" when a rear tire detreads. "Oversteer," he said, means "the rear end [of the vehicle] begins to . . . swing back and forth . . . [at a] critical speed." If the vehicle is traveling faster than the critical speed, then the "oscillation [will] continue to grow, and [the driver is] not going to be able to control the vehicle." It followed, according to Renfroe, that the Explorer was defective because its design did not allow the driver to maintain control when a tire detreaded and the detreading caused the vehicle to "hop," "tramp," and "skate."

The Trial Court's Ruling. Contrary to Stephen's assertion, the trial court did not exclude all references to Renfroe's "hopping," "tramping," or "skating." Rather, the court ruled only that Renfroe could not "give an opinion that tramping or hopping or skating can result from tread separation" because there was no foundation for such an opinion about causation.

Renfroe's Qualifications. Renfroe has a master's degree and a doctorate in mechanical engineering, and holds four patents in the design of steering systems. He worked as a mechanical engineer for Alcoa, and as a lecturer at Texas A & M and the General Motors Institute, and was a tenured professor at the University of Arkansas. While at the University of Arkansas, Renfroe began working as a consultant and, in 1984, founded Renfroe Engineering, a private consulting firm involved in litigation support and vehicle design.

<u>Foundational Facts</u>. Renfroe admitted that he had never assessed the existence of tramping, hopping, or skating caused by tread separations on Explorers. He admitted he had tested only two vehicles (a Ford passenger van and a Chrysler passenger van) to measure changes in steering characteristics from the "delamination" of a tire. He admitted that the Ford data he relied on to form his opinion assessed tramping, hopping and skating caused by rough roads, not tread separations, and he offered no information to suggest the result is the same (the most he had to say was, "I would think that the testing that has been done with rough surfaces is related to tread separation"). He admitted he did not know about any tests of tramping, hopping, or skating due to tread separations.

<u>Reliance on Other Experts</u>. To overcome the missing foundational facts, Renfroe proposed to testify about tread separation and loss of control based on his review of another expert's work (Dennis Guenther). According to Renfroe, Guenther got into the tread separation "arena" when he was retained by Firestone as a litigation expert and he "put together a report that [was] critical of the Ford Explorer in the event of a tread separation." Although Renfroe claimed a right to rely on Guenther's work because the National Highway Transportation Safety Administration (NHTSA) had relied on Guenther's data as correct, the evidence shows otherwise—in fact, the NHTSA's peer review of Guenther's work concluded that he was wrong when he said there was a difference between the controllability of a Ford Explorer and the controllability of other vehicles following a tread detachment.

## B.

### The Trial Court Properly Limited Renfroe's Testimony

*First*, there was no foundation for Renfroe's causation opinion. *Second*, we agree with the trial court that Stephen failed to show that Guenther's work was of a type reasonably relied upon by professionals in the field. (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524 [3 Cal.Rptr.2d 833].) *Third*, the trial court did not (as claimed by Stephen on this appeal) prohibit Renfroe from relying on the work of another expert (Stephen Arndt); the court simply ruled that Renfroe could not read Arndt's conclusions into the record. (*Whitfield v. Roth* (1974) 10 Cal.3d 874, 895 [112 Cal.Rptr. 540, 519 P.2d 588] [an expert may testify about and explain the basis for his opinion, but this rule does not mean the testifying expert can become a channel for the opinions of the nontestifying experts on whom he relies].) As a result, there was no foundation for Renfroe's opinion that there

was a defect in the design of the Explorer or that the Explorer caused Stephen's injury. (*Dimond v. Caterpillar Tractor Co., supra,* 65 Cal.App.3d at p. 177; *Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 560.)

In a related argument, Stephen contends the trial court erroneously excluded a report of a study conducted at the National Advanced Driver Simulator (NADS) at the University of Iowa. We disagree. The court refused to admit the report because it did not qualify as an official document (§ 1280) because it was not compiled within the scope of a public employee's duties (the report was based in part on work performed by a private firm retained by NADS). But although the trial court excluded the report itself, it permitted Renfroe to testify that he had based his opinion on it. Under these circumstances, and because Stephen does not claim the NADS report fills the evidentiary gaps in the foundation for Renfroe's opinions, we fail to see how the exclusion of the report could possibly have been prejudicial.

## C.

### Ford's Motion for Nonsuit Was Properly Granted

First, Stephen is simply wrong when she says Renfroe's opinion that the Explorer "became uncontrollable due to its propensity to transition into a significantly higher linear oversteer (with loss of control) than its competitors when a rear tire delamination (tread separation) occurs [was] unrebutted." In fact, it was rebutted by the NHTSA study described *ante.*

■ Second, as discussed *ante* with regard to Stephen's claim against Firestone, her product liability and negligence claims against Ford failed because they were not supported by expert testimony establishing that there was a substantial probability that a defect in the design of the Explorer's stability system caused Stephen's injury. (See pt. I.C., *ante.*) As with her case against Firestone, Stephen's claims against Ford could succeed only if supported by expert testimony establishing causation. (*Truman v. Vargas, supra,* 275 Cal.App.2d at p. 982.) With her tread detachment claim against Firestone, Stephen failed to establish that a defect in the tire caused the detachment. With her "oversteer" (directional stability) claim against Ford, Stephen failed to establish by Renfroe's testimony or otherwise that a defect in the design of the Explorer caused the loss of control when the tire detreaded.

It follows that the nonsuit in favor of Ford was proper.

## DISPOSITION

The judgment is affirmed. Ford and Firestone are entitled to their costs of appeal.

Spencer, P. J., and Rothschild, J., concurred.

A petition for a rehearing was denied December 20, 2005, and appellant's petition for review by the Supreme Court was denied February 22, 2006, S140156.