Filed 8/31/21  Martin v. Singh CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DAVIE MARTIN, | C087360 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2013-00145792) |
| v. | |
| HARDEEP SINGH, | |
| Defendant and Respondent. | |

Plaintiff Davie Martin was involved in three separate motor vehicle collisions on September 3, 2011, October 8, 2011, and December 4, 2011.  This case relates only to Martin's personal injury claims relating to the October 8 collision.  These claims proceeded to trial against defendant Hardeep Singh.  Martin testified that his shoulder was injured when his 2004 Chevrolet Avalanche was hit by Singh's dump truck.  A jury found that Singh was negligent but bore only 10 percent of the responsibility for Martin's damages.  The jury further found that Martin's damages relating to the October 8

1

collision totaled $2,200. With attorney fees and costs, the trial court entered judgment in the amount of $27,181.97 in favor of Martin.

On appeal, Martin contends (1) Singh's trial attorney engaged in prejudicial misconduct by eliciting testimony about Martin's demand for money that was inadmissible under Evidence Code section 1154,[1] and (2) the trial court erred in allowing Singh's expert witness to testify even though the testimony lacked sufficient foundation.

We conclude that the testimony elicited regarding Martin's demand for money did not constitute an offer to compromise subject to exclusion under section 1154. Moreover, any error was cured when the trial court immediately admonished jurors to ignore the questions and answers regarding possible settlement. We further conclude that the trial court did not abuse its discretion in allowing Singh's expert witness to testify. The record shows that the expert had sufficient basis to render an opinion that Singh's vehicle did not intrude into the passenger compartment of Martin's vehicle. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

In summarizing the factual record, we recount the facts in the light most favorable to the judgment. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739.)

### September 3, 2011, Collision

On September 3, 2011, Martin was involved in a rear-end collision on Highway 99. He testified that he suffered "some injuries in that incident" to his neck and middle part of his back. Martin was initially treated at an urgent care clinic. His condition was improving and he was working "[a] little bit" before October 8, 2011.

Hugh Lubkin testified that he works as a chiropractor. Lubkin treated Martin for three separate motor vehicle collisions. After the September 3 collision, Martin's

---

[1]     Undesignated statutory references are to the Evidence Code.

complaints related to a defused cervical thoracic and lumbar – primarily on the left side. Lubkin noted that Martin's left shoulder was his "number one complaint" in a review of his prior injuries. During the initial examination, Martin told Lubkin that he injured his left shoulder in the vehicle collision. Lubkin assessed Martin as having a "sprain/strain injury from a rear-end motor collision," advised him "to not work initially for at least a week," and started treatment three times per week. Before the next collision on October 8, Lubkin estimated Martin's improvement was "[i]n the 40- to 50-percentile range."

### October 8, 2011, Collision

During trial, Martin testified as follows about the collision that occurred on October 8, 2011. Martin was driving his Avalanche on Northrop Avenue when he came to a stop at a red light. Martin's vehicle had custom rims and sat a bit lower than standard. A big-rig dump truck being driven by Singh pulled up to the left of Martin's vehicle. The dump truck did not have a turn signal on. The dump truck started to make a right-hand turn and struck the front hood of Martin's vehicle. Martin "was honking [his] horn the whole time." The dump truck came to a stop after hitting Martin's vehicle. The collision shoved Martin to the right. Martin was in disbelief. After the dump truck stopped, it backed up. During the process of backing up, something came crashing into the driver's side window on Martin's vehicle and pinned his shoulder. Martin "slid away" to get unpinned. He experienced immediate pain. Martin did not initially know what part of the dump truck struck him.

The driver's side window was smashed as a result of the truck backing into Martin's vehicle. Martin testified Singh did not help knock glass out of the window. Instead, Singh asked if he could help get the shattered glass off of Martin's legs and from the floorboard of Martin's vehicle.

3

Singh testified that he did not take responsibility for causing the collision on October 8. On that day, Singh was operating a dump truck on Northrop Avenue that he estimated was 50 feet long and weighed 32,000 pounds empty. Singh's vehicle was straddling two lanes because he was preparing to make a wide turn. Singh saw Martin's vehicle from 20 or 30 feet away. His dump truck collided with Martin's vehicle. At the time, Singh suspected that the "arm" on the right side of his dump truck may have contacted Martin's vehicle. Singh did not hear anything during the collision. When they collided Singh was just starting and was going "a mile or two miles an hour." Martin was probably moving around five miles per hour. Martin did not tell Singh that he had been pinned to his seat.

After the collision, Singh did not find any marks on his dump truck. Singh also did not find any marks on Martin's vehicle other than to the windscreen and a crack in the driver's side window. Singh and Martin worked together to take all of the glass out of the driver's side window. Martin told Singh that he had been in an accident in Stockton and "[h]is neck got hurt."

Lubkin saw Martin on October 13, 2011. On that day, Lubkin did not observe any marks on Martin's body. Martin did not report any bruising. Lubkin, however, would expect bruising if Martin were "hit with any degree of force." Prior to the December 4 collision, Martin was "feeling better," and Lubkin released Martin back to work. Lubkin believed it was safe for Martin to resume his work supervising the distribution of newspapers.

Dr. Amir Jamali is an orthopedic surgeon and was Martin's treating physician. In his care of Martin, Dr. Jamali reviewed medical records of other doctors who treated Martin. On the basis of these records and Dr. Jamali's own observations, he believed that Martin sustained injuries to the anterior front portion of his shoulder joint in the October 8, 2011, motor vehicle collision. However, Dr. Jamali first saw Martin on December 12, 2013. At that point, Martin had already had an MRI done on his left shoulder in 2012.

4

However, Martin did not initially provide the MRI to Dr. Jamali. The MRI showed that Martin had "other issues with his shoulder." He had "arthritis of his AC joints and some bursitis in his subacromial bursa." Martin did not complain of pain from these preexisting conditions relating to his shoulder.

Dr. Jamali believed that the October 8 collision resulted in a tear of Martin's left labrum and supraspinatus. This was caused, Dr. Jamali opined, by "the structure that came out of the truck [that] struck Mr. Martin on the front of his shoulder directly over the biceps tendon . . . ." However, Dr. Jamali did not know how big the vehicle was that impacted Martin or how far it came into the passenger compartment. Dr. Jamali first sent Martin to physical therapy in 2017 – over three years after initially seeing Martin.

### December 4, 2011, Collision

Martin was involved in a third motor vehicle collision on December 4, 2011. Martin testified that during the December 4 collision he was injured in the right side of his neck and lumbar area, and his shoulder pain increased.

Martin visited Lubkin on December 14, 2011. After the December 4, 2011, collision, Lubkin treated Martin's left shoulder. Lubkin was "sure" that the third collision had "an effect on the left shoulder." Lubkin treated Martin in 2011 without considering about how to apportion fault for the three motor vehicle collisions. Lubkin last treated Martin in 2012 and told Martin to return "if there are any problems." Martin never returned. At trial, Martin testified that when he was "[f]eeling better" when he concluded treatment with Lubkin in March 2012.

Based on Lubkin's notes from the December 14, 2011, visit, Dr. Jamali concluded that the December 4 collision was not a minor one. Although Martin showed "dramatic improvement" to his condition by 2017, Dr. Jamali opined that Martin still required shoulder surgery on November 8, 2017. Dr. Jamali believed that Martin would require

pain medication for years following the surgery but acknowledged that Martin reported that he does not like to take medication.

*Expert Witness for the Defense*

The defense called Jesse Wobrock, Ph.D., to testify as a biomechanical expert. In preparing to render his opinion, Dr. Wobrock "reviewed information on the vehicles involved, photos of the Avalanche, [and his inspection of] the tractor trailer." Dr. Wobrock took photos and measurements of the tractor trailer. He reviewed a repair estimate for the Avalanche, "some medical records and a number of different depositions," including those of Martin, Singh, Dr. Harapido, Paige Nizarhaga, Dr. Hoddick, Dr. Samimi, and Dr. Jamali. Dr. Wobrock asked to inspect the Avalanche but was informed that it was not available for inspection. However, Dr. Wobrock received photographs of the Avalanche and was able to find crash test data and vehicle specifications. Based on the photographs of the Avalanche that included a tape measure in the images, Dr. Wobrock was able to confirm the dimensions of the Avalanche.

Dr. Wobrock ascertained that the damage to the Avalanche from the October 8, 2011, collision "was basically limited to the wind screen, which is the screen that goes along the edge of the driver's window, outer edge." There was no damage to the side view mirror or the A pillar or the B pillar. Dr. Wobrock explained that the dump truck contacted the windscreen of the Avalanche. The portion of the dump truck that contacted the windscreen of the Avalanche did not significantly damage the A pillar or the B pillar. Dr. Wobrock testified that the damage occurred as a result of "the contact between the two vehicles basically rubbing up against each other, basically a superficial type of scraping between the two vehicles." Dr. Wobrock found "no evidence" to indicate that any part of the dump truck "invaded the passenger area on the driver's side of the Avalanche" except for "potentially breaking the window." However, any contact would have been limited to "the outer portion of the wind screen." Having reviewed the

6

testimony regarding the relative speeds of the vehicles, Dr. Wobrock opined that the force of the impact "was essentially zero."

## Jury Verdict and Judgment

The jury found that Singh had been negligent, Singh's negligence was a substantial factor in causing harm to Martin, and that Martin suffered $2,200 in economic and noneconomic damages. However, the jury found that Singh was only 10 percent responsible for Martin's damages. The other 90 percent of responsibility for Martin's damages arose out of the September 3 and December 4 collisions. The jury found that Martin's total damages relating to the October 8 collision were $2,200 – representing $1,231 in past medical expenses, $989 in general damages. The jury awarded Martin nothing for future medical expenses or future general damages.

The trial court ordered Singh to pay $15,750 in attorney fees and $9,209.97 in costs and entered judgment in favor of Martin in the amount of $27,181.97. Martin timely moved for a new trial on various grounds, including inadequate damages. The trial court heard the motion. The record does not indicate whether the motion for new trial was denied by order or by operation of law. In any event, Martin timely filed a notice of appeal. (California Rules of Court, rule 8.108(b)(1)(A) & (B); *Anderson v. Chikovani* (2010) 181 Cal.App.4th 1397, 1399.)

## DISCUSSION

## I

### *Attorney Misconduct*

Martin argues that the judgment must be reversed because Singh's trial attorney engaged in misconduct by eliciting information about his demand for money in pursuit of a settlement. In Martin's view, Singh's trial attorney violated sections 1152 and 1154, as

7

well as the Superior Court of Sacramento County, Local Rules, rule 2.96(2).[2] We disagree.

## A.

### *Trial Testimony*

Singh's trial attorney, Deborah Correll, questioned Singh about the October 8 motor vehicle collision. During that examination, the following colloquy occurred:

"Q [by Correll]: Okay. Now Mr. Martin called you after the accident, didn't he?

"A [by Singh]: Yes, ma'am.

"Q: When did he call you?

"A: Either it was the very next day or day after.

"Q: *What did he ask you?*

"A: He called. I asked him how he was doing, and then after that he goes, I talked to my doctor. We can settle this for --

"MR. LASKIN [plaintiff's counsel]: Objection, Your Honor.

"THE COURT: Sustained.

"Q BY MS. CORRELL: *Did Mr. Martin ask you for money?*

"A: Yes.

"MR. LASKIN: Objection, Your Honor.

"THE COURT: Sustained.

"MR. LASKIN: Your Honor, can we approach?

---

[2] Undesignated references to rules refer to the Superior Court of Sacramento County, Local Rules.

Martin cites rule 2.95(2). Rule number 2.95 relates to motions in limine. Rule number 2.95 neither contains a subdivision (2) nor does it address compromise offers. Presumably, Martin refers to rule number 2.96(2), which does relate to offers to compromise or settle.

8

"THE COURT: Yes.

"(Sidebar discussion held off the record.)

"THE COURT: I'm going to direct that the last two questions and those answers be struck. I am instructing the jury you may not consider either the questions that were posed or any responses given. Thank you." (Italics added.)

Later, when instructing the jury on the law, the trial court informed jurors: "Each side has the right to object to evidence offered by the other side. If [I] sustain[ed] an objection to a question, ignore the question and do not guess as to why I sustained that objection. If the witness did not answer, you must not guess what he or she might have said. If the witness already answered, you must ignore the answer. [¶] During the trial I granted a motion to strike testimony that you heard. You must totally disregard that testimony. You must treat it as though it did not exist."

**B.**

### *Offers to Compromise a Claim*

Martin's claim of attorney misconduct depends on his assertion that Singh's trial attorney elicited inadmissible evidence during trial. We begin by considering whether the elicited testimony was admissible under the Evidence Code. We conclude that it was not inadmissible and therefore reject the claim of error.

The issue of whether the answers elicited by Singh's counsel were admissible under section 1154 presents a question of law. " '[W]hen the issue involves evaluating particular facts and applying established law to those facts, to the extent the trial court's decision depends on the proper construction of sections 1152 and 1154 . . . the issue is a question of law, which we review de novo.' " (*Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc*. (2018) 19 Cal.App.5th 525, 534-535 (*Arave*), quoting *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476 (*Zhou*).) Thus, we are not bound by the

9

trial court's apparent assumption that Singh's trial attorney elicited inadmissible testimony.

The Evidence Code reflects "the public policy in favor of the settlement of disputes without litigation and are intended to promote candor in settlement negotiations . . . ." (*Zhou, supra*, 157 Cal.App.4th at p. 1475.)  To this end, section 1152, subdivision (a), provides:  "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."  As a complement, section 1154 provides:  "Evidence that a person has accepted or offered or promised to accept a sum of money or any other thing, act, or service in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove the invalidity of the claim or any part of it."  Both sections 1152 and 1154 " 'stem[] from the same policy of encouraging settlement and compromise . . . .' " (*Zhou*, at p. 1475, quoting Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 1154, p. 532.)

Section 1152 is inapposite because it relates to evidence proving liability for a loss.  Here, Martin objects to the questions posed by Singh's counsel to undermine Martin's claim rather than to establish Singh's liability.  Thus, the relevant statute is section 1154.  Section 1154 precludes the admissibility of evidence of settlement offers to prove the invalidity of a claim.  (*Arave, supra,* 19 Cal.App.5th at p. 534.)  " 'It is well settled, however, that the rule which excludes offers of compromise does not apply to statements which are in nowise connected with any attempt of compromise or are statements of fact independent of an offer of compromise.  [Citations.] . . . [¶]  In considering whether a person's statement amounts to an ordinary admission or constitutes an offer of compromise, the intention of the party is dispositive.'  ' "*[I]f the party making*

*the proposal apparently intended to make no concessions but to exact all that he deemed himself entitled to, the proposal is an ordinary admission against interest and not an attempt to compromise." '* (*Moving Picture* [*Etc. Union v. Glasgow Theaters, Inc.* (1970)] 6 Cal.App.3d [395,] 402; see also *Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1494 ['If the statement was not intended as a concession but as an assertion of " ' "all that he deemed himself entitled to," ' " it is not an offer of compromise'].)" (*Ibid.*, italics added.)

Because Martin asserts attorney misconduct, he necessarily focuses on the questions posed by Singh's attorney. Martin, however, does not establish that Singh's attorney elicited testimony about a statement showing Martin intended to compromise or make a concession of his claim. The first question posed by Singh's attorney simply concerned what Martin said on his phone call to Singh. Martin's incomplete answer that "We can settle this for --" did not show that he intended to compromise his claim.

Instructive on this point is the case of *Zhou*, *supra*, 157 Cal.App.4th 1471. In *Zhou*, plaintiff Zhou was struck when his van was backed into by Thorntill. (*Id.* at p. 1473.) Zhou wrote two letters to Thorntill's insurance carrier. In the first letter, Zhou asserted physical injury from the collision and "included a request for payment of an unspecified sum to repair Zhou's van and to cover the cost of a rental car." (*Ibid.*) In the second letter, Zhou asserted that the collision complicated his medical treatments and increased his neck and back pain substantially. This second letter "urged a 'quick and confidential[] settlement for this without lawyer's involvement' although Zhou did not make a specific settlement demand." (*Ibid.*) The trial court excluded both letters as inadmissible offers to compromise. (*Id.* at p. 1474.)

The *Zhou* court held that the trial court erred in excluding the two letters even though both letters were intended to prompt Thorntill's insurer to make a settlement offer. (*Zhou, supra*, 157 Cal.App.4th at pp. 1476-1477.) The use of the word " 'settlement' " did not preclude the second letter from being admissible. (*Id.* at p. 1473;

11

see *id.* at p. 1477.) *Zhou* explained that the letters were admissible because "section 1154 only precludes admission of evidence of statements made in such negotiations 'to prove the invalidity of *the claim* or any part of it.' " (*Id.* at p. 1478.) In this case, neither the questions posed by Singh's trial attorney nor the answers given by Singh gave any indication that Martin intended to compromise on his claim or signaled the invalidity of his claim. Martin's request for money was consistent with a demand for the full amount of his claim. Section 1154 did not render the questions or the answers identified by Martin to have been inadmissible.

Our conclusion that the Evidence Code did not render inadmissible Singh's answers to his trial attorney's questions regarding Martin's demand for money, leads us to further conclude that the answers were not problematic under rule 2.96(2). Rule 2.96(2) deems filed, served, and granted "motions to exclude all reference to settlement negotiations, mediation, and materials related thereto *that are privileged under the California Evidence Code*." (Italics added.) This rule excludes offers of compromise or settlement only to the extent they are rendered inadmissible under the Evidence Code. Martin has not established that the questions and answers regarding his demand for money were inadmissible under the Evidence Code. As a result, he has also not demonstrated that Singh's trial attorney engaged in misconduct by posing questions related to that demand.

Even if the questions and answers regarding Martin's demand for money had been inadmissible, any error was promptly cured. After the colloquy that Martin deems objectionable, the trial court struck the questions and answers. Moreover the trial court immediately admonished jurors to ignore them. During the reading of jury instructions, the trial court again admonished jurors to ignore the stricken testimony. We presume that jurors heeded the repeated admonitions. (*Cassim v. Allstate Ins. Co*. (2004) 33 Cal.4th 780, 803 ["Absent some contrary indication in the record, we presume the jury follows its instructions."].) The record shows that the two questions and answers at issue were

12

fleetingly short during a seven-day trial.  The admonitions were prompt, unequivocal, and repeated twice.  "Only in extreme cases will such an admonition fail to remove the effect of counsel's conduct."  (*Tellefsen v. Key System Transit Lines* (1958) 158 Cal.App.2d 243, 247.)  This is not such a case.  Any error was effectively cured by the trial court's repeated admonitions to jurors.

## II

### *Expert Witness Testimony*

Martin next argues that the trial court abused its discretion by admitting the testimony of Dr. Wobrock even though he lacked sufficient foundation to support his opinion.  We disagree.

### A.

### *Dr. Wobrock's Testimony*

Prior to trial, Martin moved to exclude testimony by Dr. Wobrock on grounds that it was based on speculation or conjecture.  During trial, the trial court conducted a hearing under section 402 to determine whether Dr. Wobrock could testify.  During the 402 hearing outside the presence of the jury, Dr. Wobrock testified as follows:  He was hired by the defense to provide accident reconstruction and biomedical analysis of the October 8 motor vehicle collision.  To support his analysis, Dr. Wobrock received and reviewed photos of both vehicles involved in the collision, medical records, and several deposition transcripts.  The deposition transcripts reviewed by Dr. Wobrock included those of Singh and Martin.  Dr. Wobrock also reviewed property damage estimates and appraisals regarding the vehicles.

Dr. Wobrock personally inspected the dump truck – taking measurements and photographs.  He gathered "a number of scientific biomedical peer-reviewed treatises having to do with injuries to the shoulder and the mechanism involved with those types of injuries."  He consulted a crash test of a 2004 Chevrolet Avalanche.  He also drew on a

13

peer-reviewed paper he copublished on the topic of "movements of individuals involved in low speed impact collisions based on different Delta Vs or the differing magnitudes of the collision and how much individuals move and in which direction they move inside the vehicle."

Although Dr. Wobrock was able to review photographs of Martin's Avalanche, Dr. Wobrock was not able to examine the vehicle itself. The photographs, which included the vehicle's tires, were taken by Singh. Although there appeared to be an incline depicted in the photos, Dr. Wobrock believed the angle was not significant to verify his conclusion. Dr. Wobrock also relied on Autostats for the standard dimensions of Martin's vehicle. Because there was a tape measure in the photographs of the Avalanche, Dr. Wobrock was able to confirm the information provided by Autostats. Dr. Wobrock reviewed a repair estimate for the vehicle and photos that were taken on October 17, 2011. Dr. Wobrock testified he was personally familiar with the site of the October 8 motor vehicle collision.

Dr. Wobrock testified that, for purposes of his analysis, it did not matter where Martin was seated because there was no injury mechanism present for a shoulder injury. There was insufficient Delta-V between the vehicles. Moreover, no part of the dump truck entered the passenger space of Martin's Avalanche.

On cross-examination, Dr. Wobrock acknowledged that Martin had custom tires on his Avalanche but that the difference between those and the standard tires did not make a difference in his conclusion. Dr. Wobrock testified that the position of the seat inside the cab would also not have made a difference. This was because no "portion of the [dump] truck struck Mr. Martin." Dr. Wobrock described the contours of the vehicles and explained how those contours supported this conclusion. Moreover, his conclusion was supported by the fact that "[t]here's no physical evidence to indicate . . . anything went inside the passenger compartment. There's no damage to B pillar, there's no damage to the side view mirror, there's only damage to the wind screen which is just

14

cracked.  There's no evidence of any kind of intrusion into the passenger compartment whatsoever."

The trial court rejected an objection based on foundation, determining that Dr. Wobrock's testimony was admissible.  The trial court explained:  "[C]learly, the issue of whether or not the witness is or is not an expert in his field is not something that's pending before the Court.  The Court is going to permit the expert to testify. . . .  I do believe it's appropriate for the expert to be able to extrapolate the heights of those things, of different portions of the truck based on other measurements made.  Clearly, that is an area of cross, if desired."  The trial court noted that Dr. Wobrock corroborated the photographic evidence of the Avalanche from other data and that Dr. Wobrock was familiar with the location of the collision.  The trial court concluded that Wobrock had a basis for his opinion that no part of the dump truck entered the passenger space of the Avalanche.

**B.**

***Expert Witness Testimony***

Section 801, subdivision (b), provides that "[i]f a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is . . .  [¶] . . . [¶] . . . [b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  The California Supreme Court has explained that, "under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion . . . .  '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . .  [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony:  will the testimony assist the trier of fact

to evaluate the issues it must decide?" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*), quoting *People v. Richardson* (2008) 43 Cal.4th 959, 1008.) "We review a court's execution of these gatekeeping duties for an abuse of discretion." (*People ex rel. Dept. of Transportation v. Dry Canyon Enterprises, LLC* (2012) 211 Cal.App.4th 486, 493.)

The *Sargon* court emphasized that trial courts must "be cautious in excluding expert testimony." (*Sargon, supra*, 55 Cal.4th at p. 772.) Thus, the trial court "must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' (Imwinkelried & Faigman, [*Evidence Code Section 802: The Neglected Key to Rationalizing the California Law of Expert Testimony* (2009)] 42 Loyola L.A. L. Rev. [427,] 449.) The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion. (Black et al., *Science and the Law in the Wake of* Daubert*: A New Search for Scientific Knowledge* (1994) 72 Tex. L. Rev. 715, 788.) In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " (*Ibid.*, quoting *Kumho Tire Co. v. Carmichael* (1999) 526 U.S. 137, 152 [143 L.Ed.2d 238].)

## C.

### *Admission of Dr. Wobrock's Testimony*

The trial court did not abuse its discretion in allowing Dr. Wobrock to testify as a biomedical expert in regard to the October 8 motor vehicle collision. The parties stipulated to Dr. Wobrock's qualifications as a biomedical expert. Our review of the record reveals that Dr. Wobrock had sufficient basis to formulate his expert opinion. Dr. Wobrock had several sources from which to draw upon in determining the contours of the vehicles, including Autostats and photographs for the dimensions of the Avalanche and his personal inspection of the dump truck. Dr. Wobrock also relied upon the repair estimates for the Avalanche to confirm the nature and extent of the damage to Martin's vehicle. Thus, the trial court did not err in determining that Dr. Wobrock had a sufficient foundation on which to base his opinion.

We reject Martin's contention that the factors involved were too varying and indefinite to allow the expert to formulate an opinion. Dr. Wobrock's testimony indicated his certainty that the data showed Singh's dump truck could not have intruded on the passenger compartment of Martin's vehicle. Dr. Wobrock acknowledged considerations raised by Martin's trial attorney, but explained how they did not affect his conclusion. Dr. Wobrock did not purport to undertake an accident reconstruction, as Martin asserts on appeal. Instead, Dr. Wobrock engaged in a postaccident analysis in which he considered relevant data regarding vehicle contours, speeds, and subsequent repair estimate to reach a conclusion. The trial court did not abuse its discretion in finding that this analysis was admissible as expert witness testimony.

Martin also contends that Dr. Wobrock's opinion lacked foundation because it was based on amateur photographs taken by Singh. We reject the contention for two reasons. First, the photographs were not the only data sources for Dr. Wobrock's evaluation of the damage to the Avalanche. As Dr. Wobrock explained, the Autostats data for the vehicle

were consistent with the dimensions indicated by use of the tape measure in the photographs of the Avalanche. Moreover, the nature of the damage to the Avalanche was further confirmed by the repair estimate.

Second, we are not persuaded by Martin's reliance on *Stephen v. Ford Motor Co.* (2005) 134 Cal.App.4th 1363 to argue that amateur photographs are categorically excluded from being relied upon by expert witnesses. *Stephen* involved a personal injury claim arising out of a single-vehicle accident caused when tread separated from a tire. (*Id.* at p. 1365.) The trial court excluded testimony by plaintiff's expert witness regarding a purported defective tire design. (*Id.* at p. 1366.) The *Stephen* court affirmed, noting that no one had examined the allegedly defective tire and there were no forensic photographs of the tire. (*Id.* at pp. 1371, 1377.) Although there were amateur photographs of the tire, they were not sufficient to show substantial similarity between other similar tire failures and the tire failure in that case. (*Id.* at p. 1371.) As plaintiff's expert conceded, "experts generally conduct visual and tactile examinations of failed tires to determine the cause of the failure and, at the same time, to rule out other possible causes." (*Id.* at p. 1372.) Thus, the amateur photographs were not a sufficient substitute for the examinations upon which expert generally based their analysis of failed tires. (*Ibid.*) Notably, however, the *Stephen* court did not hold that amateur photographs can never constitute evidence upon which an expert witness may rely in other types of cases.

In this case, unlike *Stephen*, there was no testimony that the amateur photographs were insufficient to lend support to Dr. Wobrock's analysis. Moreover, Dr. Wobrock had other sources of evidence that corroborated the data provided by the photographs. These other types of data included the Avalanche's repair estimate, the vehicle dimensions given by Autostats, depositions by various witnesses, and Dr. Wobrock's personal inspection of the dump truck. Dr. Wobrock's consideration of the photographs taken by Singh in the analysis of the motor vehicle collision did not render his testimony

18

inadmissible under section 801.  Accordingly, the trial court did not err in admitting his testimony as an expert witness.

## DISPOSITION

The judgment is affirmed.  Singh shall recover his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/s/
HOCH, J.


We concur:


/s/
ROBIE, Acting P. J.


/s/
DUARTE, J.